UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


JULIAN ADAMS,                    :    **CIVIL NO. 4:07-CV-1103**
                                 :
            Plaintiff            :    (Judge Jones)
                                 :
      v.                         :    (Magistrate Judge Smyser)
                                 :
CHARLES KELLAR and               :
CITY OF HARRISBURG,              :
                                 :
            Defendants           :


**REPORT AND RECOMMENDATION**


**Background**.

        This Report and Recommendation addresses the motion of

the defendants for summary judgment.


        The case was initiated by a complaint filed on June 21,

2007. (Doc. 1). An amended complaint was filed on August 23,

2007. (Doc. 7).


        By Order of May 5, 2008, a motion to dismiss the

amended complaint was denied in part and granted in part. A

punitive damages claims was dismissed as to defendant City of

Harrisburg.  Procedural due process claims of the plaintiff were dismissed.  The motion was otherwise denied.

An answer to the amended complaint was filed on September 11, 2008.  (Doc. 32).

The plaintiff is Julian Adams, a former Officer of the Harrisburg Police Department.  The defendants are Charles Kellar, who at all material times was the Chief of the Harrisburg Bureau of Police[1], and the City of Harrisburg.

The plaintiff was terminated from his employment by defendant Kellar.  He claims that his termination, which occurred after he had filed his initial complaint in this case, was in retaliation for his act of bringing this civil action, in violation of his First Amendment rights.  He also claims that his termination was in retaliation against him for having testified in an arbitration hearing involving disciplinary action against a fellow police officer.  He also claims that

---

1.  He is no longer the Chief of Police.

his right to equal protection of the laws was violated and that he, as an African American, was denied equal protection on the basis of his race in that he was terminated under facts and circumstances that were materially similar to facts and circumstances under which other non-minority police officers were not terminated. He claims that there is municipal liability on the part of the City of Harrisburg as well. The plaintiff's claim is brought under 42 U.S.C. § 1983.

**The Amended Complaint**.

The amended complaint alleges that the plaintiff had been a patrol officer with the Harrisburg Bureau of Police since August of 1989, and that he had a history of exemplary performance and an unremarkable disciplinary history. In October 2003, he was on patrol with Harrisburg Police Corporal Lydell Muldrow when Muldrow became involved in an altercation with a citizen of Harrisburg. The plaintiff and Officer Muldrow charged the citizen (Blackwell) with aggravated assault, resisting arrest, and disorderly conduct. The plaintiff testified at the Blackwell preliminary hearing that he had not seen Muldrow hit Blackwell. An internal affairs

investigation was conducted concerning the incident, and
Muldrow ultimately received a disciplinary suspension as a
result of his conduct during the incident.  Blackwell
subsequently filed a federal civil rights complaint against
Muldrow, in which he also named the plaintiff as a defendant,
alleging an excessive use of force and related civil rights
violations.  That case terminated pursuant to a settlement.

The amended complaint alleges that the testimony that
the plaintiff would have given in the federal civil action
proceeding would have been unfavorable to the interests of the
Harrisburg Bureau of Police.  That case was settled at an early
stage, prior to discovery depositions.

The amended complaint alleges that defendant Kellar had
a vendetta against Corporal Muldrow and the plaintiff.  It
alleges that "Kellar's hatred is partly based upon racism. The
plaintiff is African American.  Muldrow is African American."
Corporal Muldrow filed a union grievance arising out of his
suspension.  An arbitration hearing was held on his grievance.
The amended complaint alleges that the defendants initially

4

believed that the plaintiff would provide testimony that was
favorable to the interests of the Police Bureau in defense
against Muldrow's grievance, and that accordingly the plaintiff
met with defendant Kellar and the Police Bureau's attorney to
discuss his testimony.  Defendant Kellar and the Police
Bureau's attorney then determined that the plaintiff's
testimony would not be favorable to their interests, and they
informed the plaintiff that he should not testify at Muldrow's
arbitration hearing and that he could face charges if he were
to testify.  Nevertheless, the plaintiff was summoned by
defendants Kellar and City of Harrisburg to testify during the
September 2006 Muldrow arbitration hearing.  The plaintiff
appeared and testified truthfully at the proceeding.

     Thereafter, the amended complaint alleges, the
plaintiff became the subject of a disciplinary investigation
concerning the testimony that he had given at the arbitration
proceeding and at the Blackwell preliminary hearing.  He was
stripped of most of his duties, was taken off patrol, and was
assigned to a report-writing function.  The amended complaint
alleges that the testimony of the plaintiff was unfavorable to

the interests of the City of Harrisburg and its Police
Department, and to the "hidden agenda of defendant Kellar" and
that consequently the defendants initiated disciplinary action
in retaliation against the plaintiff for his testimony. In
April of 2007, the plaintiff was told by the defendants that he
was going to be disciplined for conduct unbecoming a police
officer. He was told that, if he would not accept a two year
suspension and a successive retirement, he would be terminated.
He was presented with a draft agreement to sign. He was still
considering whether to sign the agreement when he brought this
civil action. As soon as he filed the original complaint in
this case, and while he was still considering the draft
agreement, defendant Kellar told him that he was being
discharged immediately because he had filed this civil action.

The amended complaint alleges that other non-minority
Harrisburg Bureau of Police officers have committed infractions
far more serious than any infractions committed by the
plaintiff and that non-minority police officers have not been
treated as harshly as the plaintiff.

In the Answer (Doc. 32), the defendants admit that in October of 2003 the plaintiff was on patrol with Corporal Muldrow when Muldrow became involved in an altercation with a citizen (Blackwell), that the plaintiff brought charges against Blackwell, that an internal affairs investigation was conducted concerning the incident, that Muldrow received a disciplinary suspension, that the citizen filed a federal civil rights action against Muldrow, the plaintiff and other defendants in which excessive force was alleged, that Muldrow filed a union grievance challenging his suspension, that an arbitration hearing was held, that the plaintiff met with the City attorney in advance of the arbitration hearing to discuss his potential testimony, that the plaintiff was told that he would not be called by the City as a witness based upon earlier testimony of the plaintiff concerning the incident, that counsel for Muldrow called the plaintiff as a witness at the hearing, that an internal affairs investigation was thereafter initiated of conflicting testimony given by the plaintiff at hearings involving the same subject matter, that the plaintiff was told that he was to be terminated (for conduct unbecoming an officer), and that he was offered an accommodation in lieu of

7

termination in the form of a two year suspension, after which
he would resign, to preserve his pension rights.

The pending defendants' motion (Doc. 94) for summary
judgment was filed on April 30, 2010.  The defendants'
supporting brief, LR 56.1 statement and exhibits are filed and
docketed as a part of Doc. 94.  The plaintiff's brief (Doc.
104), LR 56.1 statement (Doc. 103) and exhibits (Docs. 103, 105
& 112) were filed on June 21, 2010.  The defendants filed a
reply brief (Doc. 111) on July 7, 2010.

**Summary Judgment Standard**.

Summary judgment is appropriate if the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  "The moving party bears the initial burden
of demonstrating the absence of any genuine issue of material
fact, though the non-moving party must make a showing
sufficient to establish the existence of each element of his
case on which he will bear the burden of proof at trial." *Huang*

*v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003). In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). "Our function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).

**Undisputed Facts**.

On the basis of our analysis and assimilation of the moving parties' (defendants') Statement of Uncontested Material Facts (Doc. 94-5) and the plaintiff's Counterstatement of

9

Disputed Material Facts (Doc. 103), the following facts are not in genuine dispute for purposes of the defendants' motion for summary judgment.  The record references supplied by the parties in the LR 56.1 statements are omitted.

At all times material hereto, Charles Kellar served as the Chief of Police for the City of Harrisburg.  At all times material hereto, the plaintiff, an African American male, was employed as a police officer for the City of Harrisburg.  The plaintiff was hired as a patrol officer for the City of Harrisburg Police Department in August of 1989.

On October 24, 2003, the plaintiff and his former partner, Corporal Lydell Muldrow, arrested James Blackwell on outstanding arrest warrants.  As the plaintiff and Corporal Muldrow attempted to effect the arrest of Mr. Blackwell, the plaintiff observed Muldrow punch Blackwell two or three times.

Blackwell was arrested.  He was charged with several criminal violations arising from the arrest incident including

but not limited to a charge of assaulting the arresting
officers.

The plaintiff testified at Blackwell's preliminary
hearing in January, 2004.

At the preliminary hearing the plaintiff answered
several questions under oath as follows:

        Q.  Did you strike Mr. Blackwell at all that
        day?
        A.  No I didn't.
        Q.  Did anyone else that you saw strike Mr.
        Blackwell?
        A.  I didn't see anyone else strike him.


                        ***


        Q.  At the point in time from when you cuffed
        him from behind with Officer Gibney until the
        time you got him in the van, did any of the
        officers strike him or kick him in any way?
        A.  I didn't see any.


                        ***


        Q.  Did you see Corporal Muldrow hit my client?
        A.  No.
        Q.  Would it surprise you if we know that
        Corporal Muldrow hit my client?
        A.  Would it surprise me?

```
Q.  Yes.
A.  I'm not sure what you mean.
Q.  Okay. If - -
A.  I didn't see the hit, just like I didn't
see him hitting Corporal Muldrow.
```

Corporal Muldrow was investigated by the Internal

Affairs Division of the City of Harrisburg Police Department

for the use of excessive force during the arrest of James

Blackwell.  The plaintiff was interviewed and gave a statement

as part of the Internal Affairs investigation into Muldrow's

use of force during the Blackwell arrest.  The plaintiff was

required under Department rules and orders to be truthful in

his written statement to Internal Affairs.

In his initial written statement to Internal Affairs on

December 7, 2003, the plaintiff did not disclose that he had

observed Corporal Muldrow strike Blackwell during the arrest,

even though the plaintiff was aware that Muldrow was being

investigated for his use of force during the Blackwell arrest.

In a conversation between the plaintiff and the

Internal Affairs Investigator, Sergeant Drobynak, that took

place after the plaintiff had submitted a written statement but before he gave an oral statement, Drobynak told the plaintiff that Muldrow had admitted to striking Blackwell.[2]

On January 9, 2004, the plaintiff gave a voluntary recorded statement to Sergeant Drobynak. The plaintiff was required to testify truthfully in his verbal recorded statement to Internal Affairs.

During that recorded statement on January 9,2004, the plaintiff testified as follows:

> Q. What did Corporal Muldrow do then?
> A. Um, he with his hands he hit ah, Mr. Blackwell I believe on the right side 2 or 3 times.
> Q. You stated he hit him with his hand?
> A. Yes. His was the side his wrist, his arm.
> Q. Did he hit him with his hand, his arm, his fist?
> A. It, it I would say the, say the, I would say the, the fist.
> Q. And where did he hit him at?

---

2. The plaintiff's LR 56.1 statement denies this, but obviously misconstrues it to be a statement about the plaintiff's statement. It is not denied by the plaintiff that Sergeant Drobynak said this to the plaintiff.

13

A.  On I believe the right side cause I still
had him on the left side,
Q.  You, you still had a hold of Mr.
Blackwell's arm at the time?
A.  Yes.
Q.  And he was in handcuffs?
A.  Yeah, he was still in handcuffs yes.
Q.  How many times did Corporal Muldrow hit him
in the side?
A.  Uh, 2 or 3 times.
Q.  Did you see any objects in Corporal
Muldrow's hand at the time?
A.  No.
Q.  So it was just his fist.
A.  Just his fist yes.
Q.  Did you see him strike him anywhere other
than in the side?
A.  No just the side of the body.
Q.  Did you see him strike him in the head at
any time?
A.  No.
Q.  How did Mr. Blackwell respond?
A.  Uh, Mr. Blackwell, he, he I think we may
have took a step or two or he fell to the
ground, he dropped down to the ground I, and
then he, he dropped down to the ground and he
kind of ah, went down to the ground and he got
back up.  I think he got back up.


        In his recorded statement to Internal Affairs, the

plaintiff further stated:


        Q.  Do you feel the force used by Corporal
        Muldrow prior to reaching the man was necessary
        to effect the arrest?
        A.  Not to effect, no.
        Q.  Was it necessary for anything?

                            14

A.  No.

As a result of the Internal Affairs investigation into
Corporal Muldrow's use of force during the Blackwell arrest,
Corporal Muldrow was disciplined, receiving a six-month
suspension without pay and a demotion from Corporal to Patrol
Officer.  Corporal Muldrow, through his collective bargaining
unit, the Fraternal Order of Police, Capital Lodge, filed a
grievance of the discipline imposed on him as a result of his
excessive use of force during the Blackwell arrest.

The Muldrow grievance proceeded to arbitration.  During
the arbitration, the Fraternal Order of Police and Corporal
Muldrow were represented by Sean Welby, Esquire, and the City
of Harrisburg was represented by Frank Lavery, Esquire.  The
arbitration proceeding was held over several sessions during
the years 2005 and 2006.

The plaintiff was called as a witness at the
arbitration hearing, on September 15, 2006, by Mr. Welby
representing the Fraternal Order of Police and Corporal

15

Muldrow.  On direct examination by Mr. Welby, the plaintiff

testified that he observed Corporal Muldrow punch Blackwell in

the side a couple of times.


        At the arbitration hearing, on cross examination by Mr.

Lavery representing the City, the plaintiff testified as

follows:

        Q.  O.K. And, in fact, at the preliminary
        hearing that took place in this case you
        actually denied--or you actually indicated
        under oath that Muldrow did not strike Mr.
        Blackwell, isn't that correct?
        A.  Yes.
        Q.  So you didn't tell the truth in that proceeding,
        did you?
        A.  No.
        Q.  Why was that?
        A.  The--there was a crowd in there that was
        keen on--to me, they were trying to bring up a
        civil issue that we weren't there about, sayin'
        that they were trying to turn it into something
        else.  There was issues-they were bringing up
        about him saying he struck him with something
        black in his hand, a flashlight and everything,
        and I said no.
        Q.  O.K. And you knew that was a lie, isn't
        that correct?
        A.  Yes.
        Q.  And you lied under oath in front of a
        district justice with criminal charges pending
        against a man, isn't that right?
        A.  I didn't--I didn't tell the truth.

16

Q.  Isn't that what you did? Isn't that a lie?
Not telling the truth, isn't that a lie?
A.  Yes.


Chief Kellar was present at the Muldrow arbitration hearing and heard the plaintiff's testimony.


Following the plaintiff's testimony at the Muldrow arbitration, Chief Kellar referred the matter to Internal Affairs for investigation of the plaintiff for giving false testimony under oath in the Blackwell preliminary hearing.


On September 18, 2006, three days after his testimony in the Muldrow arbitration, the plaintiff received written notification that he was under investigation for "the allegation that you gave untruthful testimony at a preliminary hearing, possibly perjuring yourself."


The plaintiff submitted a written report attempting to justify the differences in his prior testimony and statements to the Internal Affairs investigator, Detective Belinda, on September 22, 2006.

17

The plaintiff submitted to a recorded interview with Internal Affairs on October 18, 2006 during which he was represented by attorney Welby and Detective David Lau, Grievance Chairman for FOP Capital Lodge #12.

As part of the Internal Affairs investigation, Detective Belinda consulted with the First Assistant District Attorney for Dauphin County about the plaintiff's situation without revealing the name of the officer involved. The Assistant District Attorney based upon what Detective Belinda told him told Detective Belinda that some statement about the plaintiff's Blackwell preliminary hearing testimony would in the future need to be made to the attorney for any criminal defendant in a case in which the plaintiff was a potential witness.

On January 17, 2007, the Internal Affairs investigation of the plaintiff was concluded with a recommendation that charges be sustained for violation of Article I, conduct unbecoming an officer, and Article III, neglect of duty. The

maximum potential penalty for conduct unbecoming an officer is termination form the Police Department.

After Chief Kellar received the Internal Affairs recommendation, he consulted with then First Assistant United States Attorney for the Middle District of Pennsylvania, Martin C. Carlson, and Dauphin County District Attorney, Edward Marsico, Jr., regarding whether the plaintiff's conduct, characterized by Chief Kellar as lying under oath at the Blackwell preliminary hearing, would be conduct that the prosecution would need to disclose to the defendant in future criminal cases in which the plaintiff was to be a potential witness.

On March 22, 2007, then First Assistant U.S. Attorney Martin C. Carlson wrote a letter to Chief Kellar in which he stated:

> In short, absent some definitive ruling by our courts that this information need not be disclosed, it would be my view that Officer Adams' admitted falsification should be disclosed to the defense by our office in any cases in which this officer is an affiant or a potential government witness in order to

fulfill our constitutional obligations under
Brady, Giglio and Franks.  This action, which
is compelled by our constitutional obligations,
will severely limit our ability to consider
prosecuting cases in which the officer is a
material witness.

On May 14, 2007, Dauphin County District Attorney
Edward M. Marsico, Jr., authored a letter to Chief Kellar in
which he stated:

Under applicable case law, our office has a
duty to disclose material facts to defense
attorneys which are known by us and are
relevant to witness credibility and could
potentially provide grounds for impeachment of
witnesses.  As such, I believe that a statement
by an officer admitting that he or she had lied
under oath would be relevant and material
impeachment information which our office would
be required to disclose to the Court and
defense in any cases in which Officer Adams was
a witness.  Because I believe that Officer
Adams' admitted falsification should be
disclosed to the defense by our office whenever
he is a witness, our ability to prosecute cases
in which Officer Adams is a material witness
will be severely compromised.

The plaintiff was informed by Chief Kellar in April of
2007 that he would be terminated from the police department for
the offenses of conduct unbecoming an officer and neglect of

duty based upon the plaintiff's Blackwell preliminary hearing
testimony.

Representatives of the Fraternal Order of Police, Jason
Brinker, David Lau, and the FOP's counsel, Sean Welby, Esquire,
immediately began negotiations with the City in an effort to
save the plaintiff's pension in light of his eighteen years of
service as a City of Harrisburg police officer.

Between April of 2007 and June of 2007, the plaintiff's
FOP representatives, including his counsel, Mr. Welby,
negotiated an arrangement in which the plaintiff would be
terminated from employment under circumstances that would
preserve his entitlement to a pension. Specifically, the
agreement negotiated on behalf of the plaintiff by Mr. Welby
and the FOP contained the following material terms: (1) the
plaintiff would be suspended without pay for approximately two
years until the day on which he would have logged 20 years of
employment by the police department; (2) on the day on which
the plaintiff had achieved 20 years of employment, the
plaintiff would resign; (3) the plaintiff would be

permitted to sell accrued vacation and leave time back to the City to fund additional contributions to his pension; (4) the plaintiff and his family would maintain their health insurance coverage for those two years and then be entitled to additional health insurance coverage starting in 2012; (5) the plaintiff would release all claims against the City.

The plaintiff's attorney, Mr. Welby, and the plaintiff's FOP representatives recommended to the plaintiff that he accept the agreement negotiated by them on the plaintiff's behalf.  The plaintiff did not accept the negotiated agreement.  The plaintiff initiated this civil action.

The City of Harrisburg and the Fraternal Order of Police considered the initiation of this civil action to be a rejection of the proposed agreement in which the plaintiff would have agreed to release all claims against the City.

As a result of the plaintiff's rejection of the proposed agreement, the City of Harrisburg continued with its

22

original decision to terminate the plaintiff.  A termination hearing was held on June 29, 2007.  The plaintiff was terminated upon a departmental finding of neglect of duty and of conduct unbecoming an officer, based upon his false testimony at the Blackwell preliminary hearing.

The plaintiff claims that he was disciplined more harshly than non-minority officers who committed the same violation(s).

The plaintiff testified at his deposition that various police officers from the City of Harrisburg, some Caucasian and some African American, had committed violations that the plaintiff deemed more serious than his own violation.

The plaintiff has focused on the disciplinary process and outcome involving Detective Ryan Neal, a Caucasian vice detective, as a comparative process for equal protection purposes.

On January 15, 2009, Detective Neal was charged by his immediate supervisor, Sergeant Holmes, with a failure to conduct a proper investigation. He was not subject to possible termination based upon this charge.

The discipline against Detective Neal stemmed from statements he had made in sworn affidavits seeking two search warrants. In the first application, Neal had stated that a confidential informant had stated to Neal that a certain person was in a house during a drug buy. Although the confidential informant had made such a statement, Neal knew that it was not true. Neal knew from officers who had surveilled the drug buy that the person was not in the house. Neal stated in the application that the confidential informant had stated that the person was in the house during a drug buy without any other statement to show to the judicial officer that as was known to Neal the person had in fact not been in the house. In the second application, Neal wrote in a warrant application that a drug transaction had occurred inside a house when the drug transaction had in fact occurred at the front door of the house.

Neal's immediate supervisor, Sergeant Brenda Holmes, stated that Neal's incorrect statements constituted sloppy police work.

Neal was not charged with a disciplinary violation for which he was subject to termination.  He was charged with a failure to conduct a proper investigation.  Chief Kellar imposed a penalty in the case of Neal's misconduct of a two day suspension and a twelve month retraining program.  Neal was removed from the vice unit.  Neal accepted the discipline.

Captain Baldwin and Chief Kellar further consulted with District Attorney Edward Marsico to determine whether Neal's untrue search warrant sworn statements were matters that would need to be disclosed under Brady to charged criminal defendants as a part of discovery.  The District Attorney concluded that there were neither criminal nor Brady implications in Neal's violations.

**Discussion**.

      In his initial complaint (Doc. 1), filed before he was terminated from his job, the plaintiff's claim was that after Blackwell, the citizen arrested by Corporal Muldrow and the plaintiff in October of 2003, had filed a federal civil action against Muldrow and against the plaintiff alleging an excessive use of force in the course of the October 2003 arrest, and after that federal case had settled, the plaintiff had been instructed by defendant Kellar not to testify at the September 2006 Muldrow disciplinary grievance arbitration. But the plaintiff was summoned to appear at that proceeding and did appear and did testify truthfully, and then became the subject of an internal investigation based upon his testimony. He was stripped of his duties, taken off patrol and assigned report-writing duties. His testimony had been at odds with the defendant's "hidden agenda" involving a vendetta against Muldrow, he alleges. In April of 2007, he was told that he must accept a two year suspension and then retire, for conduct unbecoming an officer, or else he would be terminated. He claimed, in the initial complaint, a denial of equal protection

based upon race in that he was being disciplined more severely than white officers for a similar or a less serious infraction, and he claimed that the discipline was in retaliation for his arbitration hearing testimony.

In the amended complaint (Doc. 7), filed two months later and after his termination, the plaintiff added the City of Harrisburg as a defendant and alleged further that after he had filed this civil action, and before he had decided whether to accept the offer of defendant Kellar to avoid termination by agreeing to a two year suspension followed by retirement, he was terminated from his job by defendant Kellar for having filed this civil action.  His remaining claims against both defendants in the amended complaint are his claim of retaliation for the exercise of his right to testify (at the Muldrow arbitration) and to bring a civil action (this case) and his claim of an equal protection violation.  He adds a *Monnell* claim against defendant City of Harrisburg.

**First Amendment Retaliation Claim**.

Retaliation for the exercise of First Amendment rights is a constitutional violation. *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977); *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990)("Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."). A plaintiff must first establish an adverse action. Here, a termination from employment was an adverse action. The plaintiff must also establish an exercise of his constitutional rights. The plaintiff giving testimony at an arbitration was a right that he had. His use of the courts to resolve grievances was a right that he has.

"In a First Amendment retaliation case, the plaintiff has the initial burden of showing that his constitutionally protected conduct was a "substantial" or "motivating factor" in the relevant decision." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). "Once the plaintiff carries this burden, the burden shifts to the defendant to show 'by a preponderance of

28

the evidence that [he or she] would have reached the same decision even in the absence of the protected conduct.'" *Id.* at 235 (quoting *Mount Healthy, supra*, 429 U.S. at 287).

The plaintiff's First Amendment claim alleging retaliation for bringing this civil action is under the undisputed facts a claim as to which the defendants have established that they are entitled to summary judgment for the reason that they had told the plaintiff previously that he would be terminated if he did not accept the resignation and suspension compromise and because they reasonably could consider this lawsuit to be a rejection of that compromise.

There is not a genuine dispute that the decision to terminate the plaintiff from his employment as a Harrisburg City police officer had been made before this case was filed. The issue pending when this case was filed was whether he would accept the offer to him of a lengthy suspension and a delayed resignation so as to permit him to have a pension. The time allotted to the plaintiff in which to accept the offer had either expired or was about to expire, but whether or not it

had expired is not a material factor.  Then the plaintiff filed

this civil action, and then he was terminated.  The plaintiff

was terminated on the stated grounds that he had committed the

offense of conduct unbecoming an officer in that he had falsely

testified at the Blackwell preliminary hearing that he had not

seen Muldrow strike Blackwell and because defendant Kellar had

determined that in future criminal cases in which the plaintiff

would be a witness there would need to be a disclosure to the

defense of his false statements.  The plaintiff knew of

defendant Kellar's plan to terminate him when, on June 21,

2007, he filed this civil action.  He was going to be

terminated, he had been told, unless he were to accept the

proposed agreement for a suspension to be followed by his

resignation.  A reasonable inference can not be drawn from the

circumstances presented that the plaintiff was terminated for

filing this civil action, or in other words that his

termination would not have occurred if he had not brought this

civil action.

          The plaintiff's other claim of retaliation is that the

Chief disliked Muldrow, the plaintiff's testimony at the

Blackwell preliminary hearing was favorable to Muldrow, the
Chief wanted to prevail but did not prevail at the Muldrow
arbitration hearing, and the Chief assigned some blame to the
plaintiff, as a Muldrow friend, for not prevailing against
Muldrow.

The Muldrow arbitration hearing testimony provided an
evidentiary basis for defendant Kellar's finding that the
testimony of the plaintiff at the Blackwell preliminary hearing
was false testimony.  A reasonable inference can be drawn that
it was the testimony of the plaintiff at the Blackwell
preliminary hearing that was the basis for the decision of
defendant Kellar to terminate the plaintiff as an officer, not
on the basis that it favored Muldrow but on the basis that it
was found to be false.

The plaintiff's declaration states that defendant
Kellar and Attorney Lavery told the plaintiff that he would be
terminated if he were to show up at the Muldrow arbitration
hearing.  They told him, he states, that his Blackwell
preliminary hearing testimony was perjury.  They told him, he

states, that the "would let it go if [he] simply did not show up to testify at Muldrow's hearing." (Declaration of Julian Adams, Doc. 103-13). An inference of retaliation for the plaintiff's appearance at the arbitration hearing is, however, not reasonably or plausible, since the substance of his testimony there contributed both to grounds for disciplining Muldrow and to grounds for terminating the plaintiff.

It will be recommended that the motion of the defendants for summary judgment be granted as to the plaintiff's claims of retaliation by the defendants for the plaintiff's exercise of his First Amendment rights.

**Equal Protection Claim**.

Turning to the defendants' motion for summary judgment as to the plaintiff's equal protection claim, we observe at the outset that it is a Section 1983 claim. It is not a Title VII claim or a Pennsylvania Human Relations Act claim.

> To assert an equal protection claim based upon membership in a protected class, the plaintiff must demonstrate (1) that he or she is a member of a protected class and (2) that the

32

government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F.App'x 555, 559 (3d Cir. 2005); *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992) (requiring plaintiffs to demonstrate differential treatment on the basis of membership in a protected class). When alleging the existence of individuals outside the protected class, a plaintiff "cannot use allegations ... that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief." *Young v. New Sewickley Twp.,* 160 F.App'x 263, 266 (3d Cir. 2006) (citing *Evancho v. Fisher,* 423 F.3d 347, 354-55 (3d Cir. 2005)). The plaintiff must instead identify individuals outside of the plaintiff's protected class who received differential treatment. *See Harris v. New Jersey,* No. Civ. A. 02-2002, 2008 WL 141503, at *10 (D.N.J. Jan. 14, 2008); *Lane v. Culp,* No. Civ. A. 05-576, 2007 WL 954101, at *1 (W.D.Pa. Mar. 28, 2007). In this respect, the evidence required to prove a protected-class equal protection claim is equivalent to that required for a Title VII disparate treatment case. *See Black v. Columbus Pub. Sch.,* 79 F.App'x 735, 738 (6th Cir. 2003); *Andrews v. City of Phila.,* 895 F.2d 1469, 1483 n. 4 (3d Cir. 1990) (observing that both Title VII and equal protection claims require proof of

discrimination based upon membership in a
protected class).

*Terrell v. City of Harrisburg Police Dept.*, 549 F. Supp.2d 671,
687 (M.D.Pa. 2008).


In the summary judgment context, where the plaintiff
has the trial burden of proving his claim and the defendant is
the party moving for summary judgment, the equal protection
issue is properly framed as whether there is evidence
sufficient to support a reasonable inference that the
plaintiff, a member of a protected class, was treated in a
materially different (and less favorable) manner as to a
certain decision or action by the defendants than persons not
in the protected class even though the plaintiff and the other
persons were similarly situated as to the factors that are
material to the particular decision or action.


The defendants argue that there is no similarly
situated person not in the plaintiff's protected class who was
treated differently from the way in which the plaintiff was

treated by the defendants.  Although the plaintiff asserts

generally that there were other instances of officers who but

for race were in a similar situation to his and were treated

differently by the defendants, and although he refers to other

officers having given false statements about use of force in

the October 2003 arrest of Mr. Blackwell, both the defendants

and the plaintiff have focused principally upon the case of

Officer Ryan Neal in the discussion of the equal protection of

the plaintiff.  We will limit our summary judgment analysis to

the Neal comparison.[3]


The plaintiff's discipline was imposed in 2007 for

conduct that occurred in 2003.  The discipline of Officer Neal

in 2009 was for conduct occurring in 2008 and early 2009.  The

different time frameworks do not make a material difference.

Defendant Kellar was the Chief of Police throughout this entire

relevant period and he made the final disciplinary decision in

both officers' cases.

---

3.   Whether or not the plaintiff at trial should be permitted to
present evidence relating to putatively similarly situated persons
other than Officer Neal is not addressed herein.

The defendants argue that there are material differences between the two officers' violations and that the differences include the reasons for discipline, the charges, the outcome of district attorney review and the effect upon the officer's ability to go forward and to function as a police officer.

Each officer was accused of conduct that can reasonably be classified as having made false statements under oath, one as a witness testifying in court and one as an affiant presenting applications to a judge for orders authorizing the searches of persons' homes. The two officers plainly were treated differently by the defendants, one receiving a two day suspension and the other a termination. The court must decide in this present context of a summary judgment motion whether a jury could reasonably infer that the two officer's violations and other significant factors are materially similar.

There is not a significant difference in the reasons for disciplining one officer who has made false statements in

court testimony and another officer who has made false

statements in search warrant affidavits.  Police dishonesty,

perhaps particularly as to matters affecting individuals'

rights, are harmful to the objectives of our justice system,

and accordingly to police department interests.  There is a

significant difference between intentional and knowing false

statements on the one hand and, on the other hand,

unintentional false statements.  Here, one officer's false

statements were characterized by the defendants as careless or

sloppy while the other's were characterized as intentional.

Whether these characterizations were reasonable is a material

issue that is in genuine dispute.  Upon our careful review of

the record, we find there to be a genuine issue as to the state

of mind of each officer in making false statements.  There is a

genuine issue as to whether the defendants' finding of a

material dissimilarity is incorrect.


        The defendants describe the false statements under oath

of the plaintiff as knowing and intentional and those of

Detective Neal as sloppy police work.  The plaintiff describes

the false statements of Detective Neal as knowing and intentional and those of the plaintiff as a matter of a misunderstanding of questions asked in the proceedings.

The plaintiff in his brief asserts, "Plaintiff never committed perjury or otherwise gave sworn testimony that was knowingly false with the intent to deceive anyone." He argues that it should have been accepted as true by defendant Kellar that he construed the questioning at the Blackwell preliminary hearing about whether Muldrow had struck Blackwell as concerning whether Muldrow had struck Blackwell on the head, since that was the subject of the complaints of excessive force that had been presented and because the plaintiff considered the preliminary hearing questions to be focused upon that particular kind of striking force. The plaintiff states in his Declaration:

> 12. After the Blackwell preliminary hearing, I learned that there was a disciplinary investigation of Lydell Muldrow for the use of excessive force in the arrest of James Blackwell. The investigation was conducted by Sergeant Drobnak. Sergeant Drobnak and I discussed my testimony at the preliminary

hearing, and how that he thought that when I said I didn't see any hits to Blackwell's head that it was a little sloppy on my part. He reminded me that even Muldrow admitted to hitting Blackwell after Blackwell began resisting arrest. This refreshed my recollection that I did observe Muldrow give Blackwell a couple of shots to the body to control him, as I said during my interview with Drobnak. At the time of the preliminary hearing, I was focused on the questions and discussion about Muldrow allegedly striking Blackwell in the head with his flashlight and/or his fists because I had heard that there were allegations that this is what he did, and I knew I didn't see any such hits. This is why I testified the way I did, and it was all truthful.

13. I am required as a police officer to give sworn statements during the course of disciplinary investigations like the one Drobnak was conducting, and to answer all of his questions as directed. He told me at one point that he had concluded that the force used by Muldrow was not necessary for anything, and, because he interviewed more people than me and was the person charged with making those conclusions, I agreed with him. At no time did Drobnak tell me that he thought I testified falsely or that there was anything that I could be disciplined for. He counseled me to be more careful in my testimony in the future. This was in early 2004, and I didn't hear anything more about it until I was called in to talk to Mr. Lavery in October 2005.

14. I was involved in the arrest of James Blackwell on October 24, 2003. I was advised

39

that Blackwell was armed and extremely
dangerous, and I knew of him from past
involvement with the Harrisburg Police.
Officer Muldrow and I were assisted by numerous
officers that evening who all claimed in their
orchestrated testimony that Officer Muldrow
"beat Blackwell up" this is completely untrue
and false. These officers all testified
falsely, as confirmed by the Arbitrator's
findings in the Muldrow matter.


****


18. In early October, 2005, I was instructed
to come to the Chief's Office to meet with him
and Attorney Lavery. I met with Lavery himself
on October 11, 2005, and I met with the Chief
and Lavery about a week before then. Lavery
and the Chief obviously did not want me to
testify at Muldrow's arbitration. Attorney
Lavery personally ordered me to not attend
Muldrow's hearing, and if I did so, I would
suffer consequences. Lavery also told me not
to speak with Sean Welby who was my union
attorney. Lavery also advised me there was a
lawsuit against Muldrow and the City and they
would have to pay a lot of money over this. He
threatened me by saying that what I did was
perjury, but that he and the Chief would let it
go if I simply did not show up to testify at
Muldrow's hearing.

19. After October 11, 2005, I never attended
any hearing regarding Corporal Muldrow. I know
that I never ever testified falsely with the
intent to deceive, committed false swearing or

40

committed perjury, but I had also been a
Harrisburg Police Officer long enough to know
that that police officers can be abused,
disciplined, and lose their job when they
become a target of Kellar's vendettas. I was
afraid for my family and for the community I
serve as a police officer, which is why I did
not show up for any arbitration hearings until
ordered to do so by Chief Kellar.

20. I was very surprised and quite anxious
when I learned from detective Lau that I was
ordered by Chief Kellar to appear for the
September 15, 2006 hearing or be disciplined.
I told Lau I felt I should be prepped for the
hearing because it had been so long since I had
gone over this matter, and did not understand
why it was Lau who was contacting me, but that
he didn't tell me I have any right to
representation. This was all a complete
contradiction of what Mr. Lavery advised me to
do previously, and I was very confused and
nervous about it all.

21. Mr. Lavery also advised me that [what] I
supposedly did was considered "perjury" and the
Chief is willing to let this go if plaintiff
did not testify for Muldrow. I was intimidated
by the direct threats and in jeopardy of losing
my whole career. I totally relied on Mr.
Lavery as an expert and did what I was told to
do. I agreed with statements he made in his
questions to me, but knew then and know now
that I never testified falsely with the intent
to deceive or made a false swearing or perjury.
I simply agreed that the whole truth did not
come out in my testimony (a whole truth that I
did not know and in response to some very
inartful questions at the preliminary hearing),

41

and that in that sense it can be called lying.
I had no representation and should have, and
they should have told me I had a right to it.

22.  Mr. Lavery and the Chief spoke to me
without any Union rep and or attorney which I
thought was extremely odd at the time.  If I
committed perjury and was going to be
disciplined at the time I should have been
given the right to be advised by my attorney
and/or Union Rep.

23.  I was treated totally different from
officers Canfield, Neal, Holmes, Godusky, and
Galkowski (all Caucasian) who all testified at
the arbitration hearing that Muldrow punched
Blackwell in the head.  If Muldrow hit
Blackwell in the head, I would have seen it
because they were both in my presence the whole
time.  The testimony of these officers is all
lies and known to be so by Kellar at the time,
and likely orchestrated by defendants.

(Declaration of Julian Adams, Doc. 103-13).


     Although a reasonable inference can be drawn that the

plaintiff knowingly testified untruthfully at the Blackwell

preliminary hearing, that proposition is in genuine dispute in

this case.

A reasonable inference can be drawn that the plaintiff had admitted to knowingly testifying falsely, but that too is in dispute. It is not free from genuine dispute that the plaintiff admitted to Blackwell hearing false swearing in his Muldrow hearing testimony. The plaintiff's acknowledgment at the Muldrow arbitration hearing that his testimony at the preliminary hearing that Muldrow had used no striking or hitting force had not been truthful and that not telling the truth is a lie is reasonably construed as an admission by the plaintiff that he had knowingly given untruthful testimony at the Blackwell preliminary hearing. But the plaintiff denies that it was an admission, and other interpretations of what he stated may be plausible.

The plaintiff has been found through the Police Bureau's fact finding process to have given false testimony, but he has not been found independently of that process to have given false testimony. He was not charged with perjury. The defendants ask the court to defer to police department administrative fact finding. In this context, where the claim

43

is one of a denial of equal protection in administrative fact finding, the defendants' request is out of place.

The Arbitrator's Opinion (Doc. 103-14, Exh. Q) in the matter of the arbitration of the Muldrow suspension reveals that there was a wide range of often inconsistent sworn testimonial assertions of officers and witnesses concerning the events of October 23, 2003 involving the arrest of Mr. Blackwell. Some of these police officer witnesses testified that they had seen Officer Muldrow strike Mr. Blackwell in the head and in the face. Citizen witnesses had testified that Blackwell was hit with a flashlight or a billy club. Officer Neal had testified that punches were thrown by Muldrow to Blackwell's head. The Arbitrator, following extensive discussion of very far ranging testimony, found that Mr. Blackwell was not struck by Officer Muldrow in the head or in the face. The Arbitrator found that Officer Muldrow had used force in an effort to move Mr. Blackwell by striking him in the ribs and by attempting to strike him in other parts of his body. The Arbitrator cited the Department's  Use of Force

Policy and found that, considering the totality of the circumstances, the discipline that had been imposed as to Officer Muldrow was excessive.

No officer who testified at the arbitration hearing other than the plaintiff was disciplined on the basis of testimony given relating to the Blackwell arrest incident.

The plaintiff claims that he, an African American officer, was treated differently from how Detective Ryan Neal, a white officer, was treated in materially the same circumstances. Neal had written two search warrant applications containing factual errors. Neal had in one instance stated in an application for a search warrant that a confidential informant had said that a certain named person sold drugs to the confidential informant inside a certain house. In that instance, while it was true that the confidential informant had said to him that he or she had purchased drugs in that house from that named person, by the time that Detective Neal made application for the search

warrant he knew that it was not that named person who had been in the house and had made the referenced sale. He knew that the named person had not been in that house at the time of the sale. But he did not note that in the warrant application. It ensued that that named person was criminally charged and, after that, the charge was dismissed against that person. (Neal Deposition, Doc. 103-16, Exh. S; Jenkins Deposition, Doc. 112).

In a later search warrant application, Detective Neal stated that a drug transaction had occurred inside a house, when in reality it had not occurred inside the house. It had occurred at the doorway of the house. He stated that one person (the confidential informant) had entered and exited the house prior to the transaction when in fact another person had entered and exited the house prior to the transaction. A charge was brought against a person as a result of evidence seized in the execution of that search warrant. That charge was later dismissed. (Neal Deposition, Doc. 103-16; Jenkins Deposition, Doc. 112).

In both matters, Detective Neal was charged with failing to conduct a proper investigation. He was determined by defendant Kellar to have violated the Code of Conduct, and was disciplined with a two day suspension. He was not charged with having made false statements under oath. He was not charged with conduct unbecoming to an officer, a violation subject to a range of punishment including termination, as was the plaintiff. As a function of the charge brought against him, Officer Neal was not subject to possible termination. He was removed from the Vice Unit in which he had been assigned, but he was not dismissed from the Department.

A more in depth, and informative, statement of the facts relating to the two search warrants is set forth by Officer Jenkins in his deposition.[4] (Doc. 112).

The defendants refer in their brief, in comparing and contrasting the Adams and the Neal cases, to Adams' false

_____

4. The deposition is under seal. Order of March 3, 2009. (Doc. 46).

swearing in preliminary hearing testimony as "lying under oath" and to Neal's false swearing in two search warrant affidavits as "two misstatements".

Although Detective Neal was not charged with false swearing, a reasonable inference can be drawn that Detective Neal's conduct involved false swearing in making statements under oath. A police officer's statement in an application for a search warrant that "a confidential informant has stated that X occurred" is, as judges, attorneys and police officers know, intended by the police officer to be considered by the judge as a basis for the judge to find that X occurred. If the police officer learns that X did not occur but states in the search warrant application that the confidential informant had stated that X occurred, that is a literally true statement but viewed in correct context is a material misrepresentation to the judge.

Assuming *arguendo* that both the plaintiff and Officer Neal both knowingly under oath made false statements, there is

a basis for a reasonable inference of disparate treatment. Assuming *arguendo* that both made "misstatements", there is a basis for a reasonable inference of disparate treatment. The level and the nature of the officer's knowledge and of the officer's intent in both instances is a matter open to a range of possible inferences. In the context of this equal protection issue, a deference to the police department's disciplinary characterizations of the conduct would not be appropriate. The evidence relating to the level and the nature of knowledge and of intent in the two situations is not amenable here to a finding that no reasonable inference of similarity can be drawn.

In our analysis of it, the defendants have not argued that the Neal and Adams situations are dissimilar on a basis that does not require the resolution of some issue of credibility. Credibility issues are not properly resolved by the court on a summary judgment motion, but must be resolved by the jury.

It is not free from genuine dispute whether the plaintiff intentionally testified falsely at the Blackwell hearing. Although the plaintiff's opinion that he has **testified clearly at all times** (Declaration of Julian Adams, Doc. 103-13) is not plausible, and although it is possibly difficult from the summary judgment record to find reasonable the plaintiff's explanation for his assertion that he did not intend to falsely state the facts in denying repeatedly at the Blackwell hearing that Muldrow had hit Blackwell, it is also difficult to find reasonable the defendants' determination that another officer's false representation to the court in a search warrant application was a comparatively minor infraction.

The false swearing of a police officer in a search warrant affidavit is as serious of a violation of police department interests as is false testimony under oath in a court proceeding. The officer preparing the affidavit has the unbridled opportunity to choose the language and the facts to be used in the affidavit. The officer testifying in court does not choose the subject matter of the question or the phrasing

of the question.  The officer in court generally does not have the opportunity to explain the answers he states to the questions.  The conditions of in-court testimony do not lend themselves to prolonged deliberation over the best articulation of facts.  The conditions under which a search warrant affidavit is prepared do not usually involve similar pressures and constraints.

A description of the plaintiff's conduct of false swearing under oath was submitted by defendant Kellar to the Dauphin County District Attorney and to the United States Attorney for the Middle District of Pennsylvania and both prosecutors advised defendant Kellar that criminal case defendants in future cases in which the plaintiff was involved as an investigator or witness would need to be informed that the plaintiff had testified falsely under oath.  A description of Detective Neal's conduct was submitted by defendant Kellar to the District Attorney of Dauphin County.  The District Attorney of Dauphin County told defendant Kellar that criminal defendants in future cases in which Detective Neal is an

investigator or a potential witness will not need to be told
that Detective Neal had made false statements in search warrant
affidavits.  The summary judgment record does not include
evidence of the description of the facts presented to the
prosecutors in the meeting leading to the prosecutors' letters.

The defendants have not argued that an officer's false
statement under oath in a search warrant application is not as
serious of a trespass against the objectives of the justice
system as an officer's false statement under oath in courtroom
testimony.  The difference that the defendants are advancing is
one of state of mind.  They advance the theory that the
plaintiff's falsehood was knowing and intentional and that
Detective Neal's false statements in two search warrant
affidavits were "sloppy police work".  This is a factual
argument, and the factual characterizations are genuinely in
dispute.

The plaintiff, like Officer Neal, had an explanation
for his preliminary hearing testimony in the Blackwell case

that if accepted as true would support an inference that he was not knowingly testifying falsely. (Doc. 94-6, Exh. C, pp. 37-44, 49-53). Some fact finders might find the likelihood of purposeful deception in the one officer's case to be greater than in the other's case.

The plaintiff's equal protection claim, based upon the comparison of his termination for testifying falsely under oath to the two day suspension of a white police officer, who on two occasions provided false statements in search warrant applications, is a claim as to which there is a genuine dispute as to material issues of fact. It may be determined by the jury at trial that the two are materially different, but that can not be found to be so on the summary judgment record.

The circumstances and the content of the plaintiff's testimony under examination by Attorney Lavery at the Muldrow arbitration hearing are significant evidence in the matter of the plaintiff's claim of unequal treatment. The defendants' construction of the arbitration hearing testimony as an

admission of intentional false swearing on the part of the

plaintiff is a reasonable construction of it.  But the

plaintiff was not a party in that proceeding and was not

represented.  He had no representative there to further develop

the meaning of his answers to the questions asked of him by the

attorney for the Police Bureau.


        We conclude for the foregoing reasons that there is

evidence to support a reasonable inference that the plaintiff,

a member of a protected class, was treated in a materially

different manner, as to the decision of defendant Kellar to

terminate him from his employment, from a similarly situated

person not in the protected class.


**Qualified Immunity**.

        Qualified immunity is appropriate if the alleged

conduct of the defendant does not violate clearly established

constitutional or statutory rights of which a reasonable person

would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct.
2151, 150 L.Ed.2d 272 (2001), the Court
explained that a qualified immunity analysis
must begin with this threshold question: do the
facts alleged, viewed in the light most
favorable to the party asserting the injury,
show that the officer's conduct violated a
constitutional right? *Saucier,* 121 S.Ct. at
2156. If the plaintiff fails to allege the
violation of a constitutional right, no further
inquiry is necessary. If, however, the alleged
facts show that there was a constitutional
violation, then the next step is to ask whether
the right was clearly established. *See id.* In
other words, a court must consider "whether it
would be clear to a reasonable officer that his
conduct was unlawful in the situation he
confronted." *Id.* (citing *Wilson v. Layne,* 526
U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818
(1999)). This inquiry, the Court noted, "must
be undertaken in light of the specific context
of the case, not as a broad general
proposition." *Id.* If a court concludes that an
officer's conduct did violate a clearly
established constitutional right, then it must
deny him the protection afforded by qualified
immunity. *See id.* at 2156-57.

*Curley v. Klem,* 298 F.3d 271, 277 (3d Cir. 2002). The

plaintiff in the amended complaint alleges a violation of the

right to equal protection, a right of which defendant Kellar

would reasonably have known. Defendant Kellar is not entitled

to qualified immunity.

**City of Harrisburg as a Defendant Under _Monell_**.

The defendants acknowledge that Chief Kellar constituted the final policy making authority for discipline in the police department and that this constitutes grounds for municipal liability under _Monell v. Department of Social Servs.,_ 436 U.S. 658 (1978) and _McGreevy v. Stroup,_ 413 F.3d 329 (3d Cir. 2005) if there is a constitutional tort. If the plaintiff succeeds on his constitutional tort claim, there can be municipal liability. The motion for dismissal of the City of Harrisburg under _Monell_ should be denied.

**Recommendation**.

It is recommended that the defendants' motion for summary judgment be granted in part and denied in part. It is recommended that the motion be granted as to the plaintiff's claim of retaliation for his exercise of his right to testify (in the arbitration) and of his right to bring a civil action. It is recommended that the motion be denied as to the plaintiff's claim that his termination violated his right to equal protection of the laws. It is recommended that the

motion of defendant Kellar to dismiss on the basis of qualified

immunity be denied and that the motion of defendant City of

Harrisburg to dismiss under *Monell* be denied.  It is further

recommended that the Order of March 3, 2009 (Doc. 46) be

vacated, and that the case be listed for trial.




                                        **/s/ J. Andrew Smyser**
                                        J. Andrew Smyser
                                        Magistrate Judge

Dated:  August 16, 2010.